IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| In the Matter of the Detention of<br><br>S.M.,<br><br>Appellant. | No. 85641-3-I<br><br>UNPUBLISHED OPINION |

BOWMAN, J. — S.M. appeals his 14-day involuntary commitment order issued under RCW 71.05.240(4)(a). He claims substantial evidence does not support the trial court's conclusion that he was "gravely disabled." Because substantial evidence supports the trial court's findings, which, in turn, support its determination that S.M. was gravely disabled, we affirm.

FACTS

On June 17, 2023, Harborview Medical Center admitted S.M. after he sustained gunshot wounds to his right leg and arm. S.M. said he was at a park at 2:00 a.m. when his "phone died." So, he approached an unknown car and its passengers in the parking lot and "asked them to charge [his] phone." The driver shot him three times and then drove away. His injuries required surgery and splints on his leg and arm.

On June 21, 2023, Harborview discharged S.M. Two days later on June 23, Harborview readmitted S.M. after a second incident caused the new surgical hardware in his leg to fail, requiring another surgery. S.M. claimed he reinjured his leg during an argument with his neighbor, who was "abusing her dog."

Harborview medical staff noted that S.M. exhibited a "behavioral health disorder, demonstrated by disorganization, disorientation, [and] mood lability."

On June 27, 2023, Harborview detained S.M. for 120 hours of psychiatric evaluation and treatment. After evaluating S.M., psychiatrist Dr. Elizabeth Oduwo determined that he "has a mental disorder meeting criteria for Bipolar Disorder characterized by labile mood, agitation, impulsivity, violent behavior, elevated mood, grandiose delusions, and dangerous behaviors." She also noted that S.M. attempted to leave the hospital, refused medication, and inserted forks and knives into his arm splint, and that "per [the] surgery team," S.M.'s leg could be "amputated if he does not comply with surgical recommendations." Dr. Oduwo concluded that because S.M. "was not able to engage in meaningful discussion about safety or how he would manage his care outside of the hospital to prevent another serious injury," and because he is refusing "psychiatric treatment for his [decompensating] mental health," S.M. "should be detained involuntarily for grave disability."

On July 3, 2023, the State petitioned for 14 days of involuntary treatment, alleging that S.M. was gravely disabled under chapter 71.05 RCW and that there was a likelihood that S.M. would cause serious harm to others. Two days later on July 5, the trial court held a probable cause hearing. The State called as witnesses Harborview attending psychiatrist and consulting liaison Dr. Susan Bentley,[1] Harborview licensed clinical psychologist and court evaluator Dr. Cynthia Mundt, and S.M.'s sister, I.M.

---

[1] Dr. Bentley was "a primary care doctor for several years before returning to psychiatric training."

Dr. Bentley testified about S.M.'s physical injuries. She said that the force required to displace S.M.'s leg hardware on June 23 suggested he "jumped from a [significant] height." And she testified that S.M.'s injuries were non-weight-bearing, so improper care could result in another hardware failure, further damage, infection, amputation, or even death from infection. Dr. Bentley noted that S.M.'s original leg injury from the June 17 gunshot wound and resulting surgery was also non-weight-bearing, so "now that he's . . . had another surgery, he's at even more risk."

Dr. Mundt testified about S.M.'s mental health symptoms and their effect on his ability to provide for his essential needs. Dr. Mundt's working diagnosis for S.M. was bipolar disorder. She based her opinion on S.M. "presenting with symptoms of mania," which included "increased energy, grandiosity, grandiose delusions, a decreased need for sleep, rapid and pressured speech, [and] increased risk-taking behavior," resulting in "dangerous and harmful consequences to him and . . . some serious injuries to him recently."

Dr. Mundt also testified that based on her review of S.M.'s chart notes, "throughout his admission" at Harborview, S.M. was "very frequently agitated" and "made threatening remarks to staff and threatening gestures to them." She said that he "is having difficulty communicating about his physical needs to the extent that he is becoming aggressive with staff when he's not able to communicate about that." Even when he was in restraints, he had "a very hard time remaining calm." And when he was not in restraints, S.M. disrupted other patients by "going into their rooms despite consistent redirection not to."

3

Dr. Mundt also noted that S.M. had other recent admissions at Harborview due to bipolar symptoms. On the same day S.M. was shot, he had just been discharged from a one-week involuntary hospitalization after a " 'hypomanic' " altercation with his landlord.

Dr. Mundt testified that S.M.'s "decisions right now are greatly influenced by the symptoms of mania" and explained that his mania interfered with his ability to provide for his basic health and safety. She opined that "[o]utside of a situation where he was not having access to those regular [pain medications] and [psychiatric] medication, the degree to which he was aggressive would probably increase." She also stated that S.M. is "making really irrational decisions about his medical care" based on symptoms of delusion or grandiosity:

> Right now, he's thinking that his ability to make decisions about his medical care is better than his medical team. He's making decisions to insert things into his splints or to remove them based on his belief that he knows better. He is refusing medications and then later taking them at different times, or attempting to get up out of bed when shouldn't be putting any weight on his leg. All of those things suggest that he is currently making very poor decisions about his medical needs.

When asked what harmful consequence she foresaw if Harborview discharged S.M., Dr. Mundt testified:

> I would look back at what has occurred in recent history when he's been discharged in terms of him stopping taking medications and then rapidly being assaulted or injured in some way or getting himself into a very dangerous situation and requiring immediate readmission . . . for either psychiatric treatment or medical treatment.

Dr. Mundt believed a less restrictive order would not be in S.M.'s best interests. She did not think S.M. could properly care for his medical needs in an

outpatient setting because he had no insight into his mental illness, "telling people that he does not have a mental health problem," or his need for medication, stating that he is only "willing to accept those medications in order to get discharged." S.M. needed to be in a structured inpatient environment because he was "making poor decisions about wound care" and "remains unstable and easily agitated."

I.M. testified that S.M. had recently "behaved very manic and has been not able to really plan or anything like that in terms of taking care of his mental health." She said that S.M. appeared to be going into a manic phase just before his current hospitalization. I.M. also testified about S.M.'s dislike for medication. Finally, I.M. noted that despite S.M.'s insistence that he could live with his parents, his parents did not think they could care for him given his mental condition and medical needs.

S.M. testified that he had refused certain medications because they were "counterproductive" to his symptoms and his "purpose." But he also insisted he would take any medication "a doctor is recommending." S.M. testified that he was working with a mental health case manager to establish a primary care doctor so he could explain the side effects of his medication and find medication that "works better." He also described his plan to move in with his parents and how he put silverware in his arm splint "to keep [his] fingers mobile."

After testimony and argument by the parties, the court found the testimony of Dr. Bentley, Dr. Mundt, and I.M. credible and concluded that S.M. has a mental health disorder and was gravely disabled under both "prong A," risk of

5

serious harm to himself, and "prong B," serious deterioration in routine functioning.[2] But it dismissed the allegation that S.M. was likely to seriously harm others. The trial court entered findings of fact, conclusions of law, and a 14-day involuntary treatment order under RCW 71.05.240(4)(a) and "incorporate[d] by reference its oral findings and conclusions as reflected in the record."

S.M. appeals.

## ANALYSIS

S.M. claims that substantial evidence does not support the trial court's determination that he was gravely disabled under either subsection—or prong—of RCW 71.05.020(25). We disagree.

When, as here, the trial court has weighed the evidence, we review its involuntary commitment order to determine " 'whether substantial evidence supports the findings and, if so, whether the findings in turn support the trial court's conclusions of law and judgment.' " *In re Det. of H.N.,* 188 Wn. App. 744, 762, 355 P.3d 294 (2015) (quoting *In re Det. of LaBelle*, 107 Wn.2d 196, 209, 728 P.2d 138 (1986)). "Substantial evidence is the quantum of evidence sufficient to persuade a fair-minded person of the truth of the declared premise." *Id.* We view challenges to the sufficiency of the evidence in the light most favorable to the State. *In re Det. of B.M.*, 7 Wn. App. 2d 70, 85, 432 P.3d 459, *review denied*, 193 Wn.2d 1017, 444 P.3d 1185 (2019). And we do not disturb the trial court's assessment of witness credibility or the persuasiveness of

---

[2] *See* RCW 71.05.020(25).

the evidence. *H.N.*, 188 Wn. App. at 763; *Knight v. Knight*, 178 Wn. App. 929, 937, 317 P.3d 1068 (2014).

To commit a person for 14 days of involuntary treatment, the State must show

> by a preponderance of the evidence that a person detained for behavioral health treatment, as the result of a behavioral health disorder, presents a likelihood of serious harm, or is gravely disabled, and, after considering less restrictive alternatives to involuntary detention and treatment, finds that no such alternatives are in the best interests of such person or others.

RCW 71.05.240(4)(a). "Gravely disabled" is defined by RCW 71.05.020(25) as "a condition in which a person, as a result of a behavioral health disorder":

> (a) Is in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety; or
> (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety.

Prongs (a) and (b) of the statute set forth "two alternative definitions of 'gravely disabled,' either of which provides a basis for involuntary commitment." *LaBelle*, 107 Wn.2d at 202.[3]

When alleging grave disability under prong (a) of RCW 71.05.020(25), the State must present

> recent, tangible evidence of failure or inability to provide for such essential human needs as food, clothing, shelter, and medical treatment which presents a high probability of serious physical harm within the near future unless adequate treatment is afforded.

*LaBelle,* 107 Wn.2d at 204-05. The "failure or inability to provide for these

---

[3] *LaBelle* analyzes the definition of "gravely disabled" under former RCW 71.05.020(1) (1979). The substantive definition has not changed.

essential needs must be shown to arise as a result of mental disorder and not because of other factors." *Id.* at 205. The State need not show that an individual would fail to provide for all essential human needs; but rather, only that an individual's failure to provide for at least one essential human need would result in a high probability of serious physical harm unless adequate treatment is afforded. *See, e.g.*, *In re Det. of A.F.*, 20 Wn. App. 2d 115, 126-27, 498 P.3d 1006 (2021) (appellant's bipolar symptoms preventing him from seeking out and obtaining appropriate care for Parkinson's disease supported trial court's "gravely disabled" conclusion under prong (a) of former RCW 71.05.020(24) (2021)).

When alleging grave disability under prong (b) of RCW 71.05.020(25), the State must show "recent proof of significant loss of cognitive or volitional control." *LaBelle*, 107 Wn.2d at 208. And there must be proof that the individual "is *unable*, because of severe deterioration of mental functioning, to make a rational decision with respect to his need for treatment." *Id.*

Here, the trial court found that S.M.

> currently suffers from a behavioral health disorder (working diagnosis: bipolar disorder), which has had a substantial adverse effect upon [his] cognitive and volitional functioning as evidenced by his symptoms and presentation. [S.M.] is delusional, agitated, grandiose, engaging in increased risk behavior, and has a lack of insight into his condition.

The trial court noted that S.M. had several "interactions with others that resulted in severe injury to him" and that his repeated refusal to abide by medical instructions and medical advice "cause[d] the court real concern that serious physical harm in the near future is to be expected if he continues with that series

of behaviors." The court explained:

> Given [S.M.'s] framing of what happened leading him into care, his [multiple] comments . . . of being part of a military experience, traveling to different planets, having leprechauns in his splint or in his leg which are giving him powers, that God had demanded that he receive a bigger rod in his leg and that came to him in a dream and he wanted to manifest that, I'm very concerned that he does not have a clear history of being able to make good decisions as far as his medical care, the least of which is following the instructions of his medical providers.

As a result, the court found by a preponderance of the evidence that S.M. "is in danger of serious physical harm from a failure or inability to provide for his essential needs of health and safety" and that he

> is gravely disabled showing severe deterioration in routine functioning, evidenced by repeated [and] escalating loss of cognitive and volitional control over [his] actions such that, outside the hospital setting, he would not receive care that is essential to [his] health and safety.

Substantial evidence supports the trial court's findings and, in turn, its conclusion that S.M. was gravely disabled under RCW 71.05.020(25)(a). Specifically, S.M. suffered serious gunshot injuries, and just two days after Harborview released him, he reaggravated the injury to his leg, requiring revision surgery. Throughout his hospitalization, S.M. often needed to be restrained and medicated to allow staff to treat him. S.M. lacked insight into his mental health disorder and his need for medication. He repeatedly ignored medical advice, interfered with and attempted to avoid treatment, and refused medication. Dr. Mundt testified that because of his repeated noncompliance with medical advice, denial of any mental illness, and repeated statements that he was only taking the

medication to get released, S.M. was at a high risk for reinjuring his leg, which could result in amputation or death.

S.M. argues the trial court's findings do not support its conclusions because its "primary basis" in finding him gravely disabled was his "history of involvement in violent interactions." He points out that the risk of being assaulted is not the kind of danger contemplated by the grave disability statute. *See LaBelle,* 107 Wn.2d at 212 (appellant suffering harm by someone responding in kind to appellant's violent and hostile conduct is not the kind of danger contemplated by the statute). But the trial court did not rest its decision on S.M.'s history of violent interactions. Instead, it found S.M. gravely disabled based on evidence that his mental disorder prevented him from properly caring for his injuries, which put his health at risk.

Citing *In re Detention of J.G.,* No. 55415-1-II (Wash. Ct. App. Dec. 14, 2021) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2% 2055415-1-II%20Unpublished%20Opinion.pdf,[4] S.M. also argues that "mere noncompliance" with medical advice does not support a finding that he could not meet his essential needs. In *J.G.*, Division Two of our court determined that noncompliance with medical advice did not support a finding of grave disability when there was no evidence that the respondent's inability to provide for his essential needs put him at risk of serious physical harm. *Id.*, slip op. at 8-9. But

---

[4] "Washington appellate courts should not, unless necessary for a reasoned decision, cite or discuss unpublished opinions in their opinions." GR 14.1(c). "However, unpublished opinions of the Court of Appeals filed on or after March 1, 2013, may be cited as nonbinding authorities, if identified as such by the citing party, and may be accorded such persuasive value as the court deems appropriate." GR 14.1(a).

here, the State showed that S.M.'s inability to comply with medical advice did put him at risk of serious physical harm.

Finally, S.M. points to his testimony that he was negotiating to stay with his parents, that he was working with a medical professional to get medical care, and that he could recount his postsurgical schedule as evidence that he can provide for his own needs. But, again, we leave the weighing and balancing of competing evidence to the trial court. *Harrison Mem'l Hosp. v. Gagnon,* 110 Wn. App. 475, 485, 40 P.3d 1221 (2002).

Because substantial evidence supports the trial court's findings and those findings support its conclusion that S.M. was gravely disabled under RCW 71.05.020(25)(a), we affirm the 14-day involuntary commitment order.[5]

Bowman, J.

WE CONCUR:

Feldman, J.                          Birk, J.

---

[5] Because we conclude that the evidence supports the trial court's conclusion that S.M. was gravely disabled under RCW 71.05.020(25)(a), we need not reach S.M.'s challenge to prong (b). *LaBelle,* 107 Wn.2d at 202.